BORDERLAND COAL CORPORATION v. INTERNATIONAL ORGANIZATION OF UNITED MINE WORKERS OF AMERICA et al.

(District Court, D. Indiana. October 31, 1921.)

No. 433.

1. **Monopolies** ⬅9—**Mining and loading coal for interstate shipment held within protection of the Sherman Anti-Trust Act.**

A conspiracy to destroy the competition of a company which was engaged in the mining of coal in one state and placing it on cars for shipment to other states was in contravention of the Sherman Anti-Trust Act, § 1 (Comp. St. § 8820), forbidding combination or conspiracy in restraint of trade or commerce among the several states.

2. **Monopolies** ⬅12(1)—**Sending money to destroy competition in another state, whether spent for food or for arms, and the "check-off system," held subject to injunction.**

Where mine operators and a miners' organization were charged with conspiring in unlawful efforts to unionize and destroy competition of mines in another state, it was no reason to refuse to enjoin sending of funds by the miners' organization to advance such efforts that such funds were spent for food, and not for arms and ammunition purchased by the miners in such other state; and the raising of such funds by the "check-off system"—the retention thereof by the operator from the wages of the miner and paying over sums retained to the miners' union—held subject to injunction.

3. **Continuance** ⬅49—**Properly refused for production of evidence where defendant refused to preserve status quo.**

Where, on application for temporary injunction against an unlawful conspiracy by mine operators and mine owners to destroy competition by enforcing the unionization of mines in another state, defendant, moving for time to introduce explanatory evidence as to expenditure of money in the mining fields of such other state, refused to accede to the condition that it preserve the status quo, the application was properly denied.

4. **Courts** ⬅262(4)—**Federal District Court may enjoin those within its district from furthering conspiracy against trade in another district.**

The federal District Court in Indiana may enjoin the unlawful activities of parties in Indiana under the jurisdiction of the court in attempt-

ing to further a conspiracy and destroy the competition of a company in another state and district.

In Equity. Suit by the Borderland Coal Corporation against the International Organization of the United Mine Workers of America and others. On hearing of application for temporary injunction. Temporary injunction ordered.

Z. Vinson, of Huntington, W. Va., A. M. Belcher, of Charleston, W. Va., and E. L. Greever, of Tazewell, Va., for complainant.

Shirley, Whitcomb & Dowden and Miller, Dailey & Thompson, all of Indianapolis, Ind., Randolph & Milford, of Lafayette, Ind., Henry Warrum, of Indianapolis, Ind., Cooper, Royse, Bogart & Gambill, of Terre Haute, Ind., and William A. Glasgow, Jr., of Philadelphia, Pa., for defendants.

ANDERSON, District Judge. The bill avers and the proof shows a combination and working arrangement, a conspiracy, between the United Mine Workers of America and the coal operators in the so-called "central competitive field," to destroy what some of the conspirators call the "vicious competition" of the West Virginia mines.

[1] Almost all of the coal produced in West Virginia is shipped out of the state in interstate commerce, and the business of the plaintiff is shown to be interstate. It lifts its coal out of its mines in one state and places it upon cars for shipment in another. The evidence shows that the competition complained of and sought to be destroyed is competition in the sale of bituminous coal throughout the several states. A conspiracy to destroy such competition is in direct contravention of the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830). Section 1 of that act provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal."

The bituminous coal fields of the United States are already unionized except a portion of West Virginia and a small section of the Southwestern part of the country, and an effort to unionize the West Virginia mines is part of an effort to monopolize all the coal industry in the United States until, as one of the conspirators says, the United Mine Workers' Organization "shall cover every coal-producing state in the republic."

The method agreed upon and adopted by the conspirators to thus destroy competition was to organize or unionize the West Virginia field. These West Virginia operators desire to run their mines on a nonunion basis. The effort on the part of the defendants to unionize these mines and thus compel the operators to unwillingly run upon the union basis would result either in the suppression of this nonunion mining altogether, or would put such restrictions on it as to accomplish the objects of the conspiracy, namely, raise the price of the West Virginia product so that it could not compete with the so-called "central competitive field." The attempt to do this was continued for some time accompanied by the

usual incidents of violence and exhibitions of force, and matters progressed until a state of war existed in West Virginia which the state government was unable to put down, and upon the call of the state authorities, the President of the United States declared martial law, sent federal troops into West Virginia, and restored order.

The evidence shows that members of the mine workers' union purchased firearms and ammunition and otherwise financed the violent activities in behalf of the unionizing forces in West Virginia, and this state of war continued until the President sent troops into the state, and it is only held in abeyance because of that fact.

The evidence shows that the revenues of the mine workers' union are produced from dues and assessments laid upon the members; that these dues and assessments are by an arrangement between the miners' organization and the operators, taken from the wages of the workers in the mines by the operators and paid by them to the organization of mine workers. This is the "check-off" system. The membership is large, and the dues and assessments yield an enormous sum.

Statements made by officers of the United Mine Workers show that the miners' organization has sent into West Virginia to carry on this struggle more than two and a half million dollars, and the secretary-treasurer of that organization, in his report to the convention recently held in this city, stated that during the year ending August 1, 1921, the organization had sent into West Virginia more than a million dollars. This money was derived from the "check-off" system, and was sent to West Virginia to assist in the effort to organize the West Virginia field.

[2] The evidence without contradiction shows that ammunition and arms were purchased by members of the mine workers' union and used for the purpose of carrying on this struggle. It is claimed on the part of the defendants that the money used to purchase these arms and this ammunition and to mobilize and direct these armies came from the locals, and that no part of the money sent from here was used for that purpose, but that such money was and is used only in such peaceable ways as caring for and feeding and furnishing supplies to those union miners who have been evicted from their homes or deprived of a living or otherwise put to a disadvantage in carrying on this struggle.

If this be true, it is quite apparent that there is no difference in the activities of those who furnish the food and supplies for the army and those who furnish it its arms and ammunition. The money sent by the miners' organization derived from the "check-off" system, as above stated, is sent there to aid, abet, and assist those on the ground, actively engaged in the unlawful attempt to unionize the nonunion mines in West Virginia and destroy competition, as above stated.

The evidence clearly shows that the mine operators know—at least they know now—that this money thus contributed by them through the "check-off" system is used in this unlawful manner. It therefore follows that the use of such money should be enjoined, and the carrying on of the "check-off" system as a means for raising it should likewise be enjoined.

[3] At the conclusion of the evidence, counsel for the miners requested time to introduce some evidence explanatory of the large sums of money shown to have been sent by the organization into the West Virginia fields, and also asked for an extension of time for 30 days in which to file their answer to the bill. The court at once conceded that these requests were reasonable and indicated its willingness to grant such extensions, and stated that, owing to the great importance of the questions involved, and considering that, if the relief prayed for in the bill were granted, it would have such far-reaching consequences, suggested that it would like all the light upon the subject that could be furnished by evidence, and time for investigation, and argument as to the principles of law involved, and stated that the time requested by the mine workers' counsel would be granted, upon condition that the status quo be preserved in the meantime. Mr. John L. Lewis, the president of the United Mine Workers of America, being in the courtroom at the time, was asked by the court if he would agree to preserve the status quo—that is, cease efforts to unionize these mines in West Virginia until the court would have time to more thoroughly investigate the matter—the court stating that it would be entirely satisfied with Mr. Lewis' assurance to that effect. Mr. Lewis promptly declined to agree to desist, thus creating the emergency for the issuing of a temporary injunction, and compelling the court to act without further opportunity to investigate the important questions involved.

[4] This court cannot police West Virginia, nor does it hold that the United Mine Workers Union is itself an unlawful organization, nor will it in any way attempt to curtail its lawful activities; but it can enjoin the unlawful activities of the parties here in Indiana who are here now under the jurisdiction of this court, and a temporary injunction to that effect will be issued.